IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HOUSTON HARVEST, INC.                          :
3501 Mount Prospect Road                        :
Franklin Park, IL 60131                              :
                                                                   :
        Plaintiff,                                      :
                                                                   :
                                                                   :     Case No.:_____
                                                                   :
                                                                   :
BRETT GLASS                                            :
14717 Farley                                              :
Overland Park, KS  66221                           :
                                                                   :
        Defendant.                                  :

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Houston Harvest, Inc., by and through counsel, as and for its Complaint against Defendant Brett Glass, states and alleges as follows:

### I.
### The Parties

1.    Plaintiff Houston Harvest, Inc. ("HHI") is a Delaware corporation with its principal place of business at the address set forth in the caption above.

2.    Defendant Brett Glass ("Glass") is citizen of the State of Kansas residing at the address set forth in the caption above.

### II.
### Venue and Jurisdiction

3.    Jurisdiction in this Court is proper under 28 U.S.C. § 1332 in that there is a diversity of citizenship between HHI and Glass and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.    Venue is proper in this Court under 28 U.S.C. §1391(a).

5.      Glass engaged in a substantial amount of conduct underlying the claim asserted herein in the State of Delaware.

### III.
### Statement of Facts

6.      On or about November 2, 2006, HHI entered into a certain Asset Purchase Agreement dated as of November 2, 2006 with HHGP Holding Company ("HHGP") and Houston Harvest Gift Products, LLC ("Seller"), pursuant to which HHI, inter alia, acquired certain assets and assumed certain liabilities of Seller. Glass was a shareholder and chief executive officer of Seller.

7.      Glass became the chief executive officer of HHI and a minority shareholder as well. In connection therewith, Glass Glass and HHI entered into a certain Shareholders' Agreement dated November 24, 2006, a true and correct copy of which is appended hereto as **Exhibit A**. Glass and HHI also entered into a certain Non-Solicitation, Non-Competition and Confidentiality Agreement dated November 24, 2006, with HHI ("Confidentiality Agreement"). A true and correct copy of the Confidentiality Agreement is appended hereto as **Exhibit B**.

8.      HHI terminated Glass's employment on or about February 23, 2007. Glass filed a lawsuit against HHI in Johnson County, Kansas on or about February 28, 2007 ("Glass Lawsuit").

9.      To resolve the Glass Lawsuit and other matters, Glass and HHI entered into a Separation and Mutual Release Agreement ("Release Agreement") in March, 2007, a true and correct copy of which is appended hereto as **Exhibit C**.

10.    In or about May, 2007, HHI initiated arbitration proceedings pursuant to the American Arbitration Association against Seller and HHGP based on alleged violations of certain provisions in the Asset Purchase Agreement ("HHI/Seller Arbitration").

11.    Seller and HHGP were represented by the law firm of Grant & Eisenhofer, P.A. in Wilmington, Delaware, and attorneys Stuart Grant and Lesley Weaver with respect to the HHI/Seller Arbitration.    The arbitration hearing was scheduled to commence on January 14, 2008 in Wilmington, Delaware.

12.    Glass assisted Seller and its counsel in preparing for the HHI/Seller Arbitration proceedings.  Upon information and belief, Glass met with Seller's counsel in Delaware on one or more occasions, and/or communicated by telephone and/or email with Seller's counsel.  Upon information and belief, during those communications Glass provided Seller's counsel with information in violation of the Confidentiality Agreement, and disparaged HHI and/or one or more of its officers, shareholders, or directors.

### IV.
### Count One:  Breach of Contract

13.    The allegations set forth in paragraphs 1 through 12 are incorporated herein by this reference.

14.    The Confidentiality Agreement and Release Agreement are valid and binding.

15.    Glass breached the Confidentiality Agreement and Release Agreement.

16.    HHI suffered damages as a direct and proximate result of Glass's breaches of contract.

3

**WHEREFORE**, Plaintiff Houston Harvest, Inc. respectfully requests that the Court enter judgment in its favor and against Defendant Brett Glass for compensatory damages in the amount of $114,999, or such other amount as may be proven at trial, and award Houston Harvest, Inc. its costs, expenses, interest and attorney's fees, and provide such further relief as the Court deems appropriate under the circumstances.

August 8, 2008                           Respectfully submitted,


                                         Archer & Greiner, P.C.


                                         _/s/ Charles J. Brown, III_
                                         Charles Brown, Esq. (Bar No. 3368)
                                         300 Delaware Avenue, Suite 1370
                                         Wilmington, DE 19801
                                         Phone: 302-777-4350
                                         Fax: 302-777-4352
                                         Email: cbrown@archerlaw.com

                                         Steven B. Gould, Esq.
                                         Brown & Gould, LLP
                                         7700 Old Georgetown Road, Ste. 500
                                         Bethesda, Maryland 20814
                                         Tel: 301-718-4548
                                         Fax: 301-718-8037
                                         Email: sgould@brownandgould.com

                                         Counsel for Plaintiff Houston Harvest, Inc.


                          **<u>DEMAND FOR JURY TRIAL</u>**

Houston Harvest, Inc. requests a trial by jury.

                                         _/s/ Charles J. Brown, III_
                                         Charlie Brown, Esq. (Bar No. 3368)


                                  4

## SHAREHOLDERS' AGREEMENT

THIS SHAREHOLDERS' AGREEMENT (this "Agreement") is made as of this 24th day of November 2006 (the "Effective Date"), by and between Houston Harvest, Inc., a Delaware corporation (hereinafter referred to as the "Corporation") and Brett Glass (the "Minority Shareholder").

### RECITALS

1.  As of the date hereof, the Minority Shareholder is purchasing one hundred ten (110) shares (the "Shares") of the Corporation's common stock, par value $.01 per share (the "Common Stock"), in accordance with the terms and conditions of the Subscription Agreement attached hereto as Exhibit A (the "Subscription Agreement") for the total purchase price of One Hundred Ten Thousand Dollars ($110,000) (the "Purchase Price").

2.  The Corporation and the Minority Shareholder desire to promote their mutual interests by making certain arrangements with respect to the transfer or other disposition of the Shares and certain other matters upon the terms and conditions hereinafter set forth.

### Restrictions On Transfer

1.1  No Transfers. The Minority Shareholder shall not sell, assign, transfer, pledge, hypothecate, mortgage, encumber or dispose of (collectively, a "Transfer") all or any of the Minority Shareholder's Shares, except to the extent specifically permitted elsewhere in this Agreement. Notwithstanding the foregoing, the Minority Shareholder shall be permitted to transfer, subject to the restrictions of this section and solely for purposes of estate planning, all or any portion of his Shares to (i) his spouse or children; (ii) any trust created for their benefit or the benefit of his heirs, or (iii) his heirs by bequest. Any Transfer not permitted by this Section 1.1, or in violation of the procedures set forth in this Section 1, shall be null and void.

1.2  Transfer Notification. Subject to the restrictions on transfer set forth herein, and prior to any permitted Transfer in accordance with Section 1.1 above becoming effective: (i) the Minority Shareholder shall notify the Corporation in writing prior to any Transfer of any Shares and such notice shall set forth (a) whether any Shares proposed to be transferred are being transferred within one (1) year after the acquisition of such Shares, (b) the date and manner of the proposed Transfer, (c) the number of Shares to be disposed of, and (d) the price at which such Shares are to be disposed; and (ii) the proposed transferee of the Shares shall have provided the Corporation with a certificate, acceptable to the Corporation and its legal counsel, certifying that the transferee is a permitted transferee and that he, she or it agrees to be bound by the terms and conditions of this Agreement and any other agreements relating to the Shares in place at the time of such Transfer.

1.3  Related Parties. If the spouse or children, any trust for the benefit of the spouse or children of the Minority Shareholder or any other heirs (collectively, "Related Parties") holds any Shares, then (i) such Related Parties shall be subject to and bound by the

DC01 460026 1

1



Exhibit A

HHI20365

terms of this Agreement and (ii) each reference herein to "Minority Shareholder" shall refer collectively to the Minority Shareholder and the Minority Shareholder's Related Parties.

1.4    Corporate Acts.    The Corporation shall not transfer on its books any certificates for the Shares owned by the Minority Shareholder, nor issue any certificate in lieu of such Shares, nor issue any new shares unless it has been satisfied of compliance with each and every condition hereof affecting such Shares or certificates.

## ARTICLE II

## Corporation's Repurchase Rights

2.1    Corporation Repurchase Rights Upon Termination for Cause by Corporation or Resignation by Minority Shareholder Without Good Reason.    If the Minority Shareholder's full-time employment or affiliation with the Corporation or MMP Capital Partners (AI), L.P., a Delaware limited partnership and/or MMP Capital Partners (QP), L.P, a Delaware limited partnership or any of its or their subsidiaries, affiliates, management entities, portfolio companies or related parties (collectively, "Milestone") is terminated for Cause (as defined below), or the Minority Shareholder voluntarily resigns his employment or affiliation with Milestone without Good Reason (as defined below) (the Minority Shareholder being hereinafter referred to as a "Departing Minority Shareholder" and any such date of termination or resignation being hereinafter referred to as a "Termination Date"), then the Corporation, or Milestone (as applicable), at any time after such Termination Event, shall have, subject to any restrictions contained in the Credit Agreement (as defined below), the right to purchase, and the respective Departing Minority Shareholder shall be required to sell to the Corporation, all of the Shares held by the respective Departing Minority Shareholder at a price per share equal to the lesser of: (i) the then Fair Market Value (as defined below) or (ii) the Purchase Price.

2.2    Repurchase Rights Upon Termination Without Cause or Resignation With Good Reason.    In the event that Milestone terminates the employment or affiliation of the Minority Shareholder without Cause or the Shareholder voluntarily resigns his employment or affiliation with Milestone with Good Reason (each, a "No Cause Termination"), then:

(a)    The Minority Shareholder may, for a period of ten (10) days following the date of the No Cause Termination, require, subject to any restrictions contained in the Credit Agreement, the Corporation to repurchase the Minority Shareholder's Shares at a price per share equal to the "Repurchase Price." The "Repurchase Price" shall be (i) the Purchase Price if the No Cause Termination Date occurs on or prior to the first anniversary of the Effective Date; or (ii) the Fair Market Value if the No Cause Termination Date occurs after the first anniversary of the Effective Date.

(b)    The Corporation may, for a period of 365 days following the No Cause Termination Date, require, subject to any restrictions contained in the Credit Agreement, the Minority Shareholder to sell his Shares at a price per share equal to the Repurchase Price (as defined in Section 2.2(a) above).

(c)    For purposes of this Section 2, the death or "Disability" of the Minority Shareholder shall be deemed a No Cause Termination. For purposes of this Agreement, "Disability" means Employee's inability to render, for a period of 180 consecutive days

HHI20366

during any 365-day period, services hereunder by reason of permanent disability as shall be determined in good faith by the Board.

    2.3   Release Agreement. In the event a repurchase is triggered in accordance with either of Sections 2.1 or 2.2, the Minority Shareholder shall, prior to, and as a condition to receiving the Purchase Price or the Repurchase Price, as applicable, be required to execute and enter into a termination and mutual release agreement, a form of which is attached hereto as Exhibit C (the "Release Agreement")

    2.4   Drag-Along and Tag Along Rights.

    (a)   Drag Along. If, as a result of a Sale Event (as defined below), Milestone or its affiliates or related parties, holding at such time a majority of the Corporation's outstanding capital stock, proposes to transfer (other than a pledge) any or all of its or their shares of Common Stock to any person that is not the Minority Shareholder (a "Disposition"), then such disposing shareholder (the "Disposing Shareholder"), may, at least five (5) days prior to the consummation of the Disposition (or the actual number of days if the closing date for the Disposition is expected to occur less than five (5) days from the date of the offer), give written notice (a "Disposition Notice") to the Minority Shareholder describing the terms and conditions of the Disposition in reasonable detail and the Minority Shareholder shall be required, if requested by the Disposing Shareholder, to participate ratably in such Disposition at the same price per share as that offered to the Disposing Shareholder and on other terms consistent with any rights and preferences of the Shares. If the purchaser, pursuant to a Disposition is purchasing a specified limited number of shares of Common Stock, the Minority Shareholder shall sell, if requested by the Disposing Shareholder, to the purchaser, up to that number of the Shares owned by the Minority Shareholder that is in the same proportion to the Minority Shareholder's total ownership of the Shares as the number of shares of Common Stock being sold by the Disposing Shareholder is to the Disposing Shareholder's total ownership of the Corporation's Common Stock.

    (b)   Tag Along. In the event of a proposed Disposition, the Disposing Shareholder shall give notice to the Minority Shareholder which notice shall outline the terms of the Disposition, including the date on which it is expected to occur, the number of shares of Common Stock to be sold, the number of the Minority Shareholder's Shares proposed to be sold and any other material information concerning such Disposition. The Minority Shareholder will have twenty (20) days after the receipt of such notice in which to respond in writing as to whether or not it elects to be included in the proposed Disposition on the terms set forth in the notice. The Minority Shareholder shall agree to be included in full with respect to all of the Shares required to be sold or lose the right to participate in the Disposition and shall participate on the same terms as those applicable to the Disposition. The Minority Shareholder will have no right to negotiate the terms or conditions of any such Disposition and will participate in the Disposition on an as is basis with the Disposing Shareholder.

    2.5   Market Stand-Off. In connection with any underwritten public offering by the Corporation of its equity securities pursuant to an effective registration statement filed under the Securities Act of 1933, as amended (the "Securities Act"), including the Corporation's initial public offering, the Minority Shareholder shall not directly or indirectly sell, make any short sale of, loan, hypothecate, pledge, offer, grant or sell any option or other contract for the purchase of, purchase any option or other contract for the sale of, or otherwise dispose of or

HHI20367

transfer, or agree to engage in any of the foregoing transactions with respect to, the number of the Shares held by the Minority Shareholder without the prior written consent of the Corporation or its underwriters. Such restriction (the "Market Stand-Off") shall be in effect for a period of time following the date of the final prospectus for the offering as may be requested by the Corporation or its underwriters. In the event of the declaration of a stock dividend, a spin-off, a stock split, an adjustment in conversion ratio, a recapitalization or a similar transaction affecting the Corporation's outstanding securities without receipt of consideration, any new, substituted or additional securities which are by reason of such transaction distributed with respect to any common stock subject to the Market Stand-Off, or into which such common stock thereby become convertible, shall immediately be subject to the Market Stand-Off. In order to enforce the Market Stand-Off, the Corporation may impose stop-transfer instructions with respect to any of the Shares held by the Minority Shareholder until the end of the applicable stand-off period. The Corporation's underwriters shall be beneficiaries of the agreement set forth in this Section 2.5.

    2.6    <u>Certain Definitions</u>. For purposes of this Agreement, the following definitions apply:

    (a)    "<u>Cause</u>" shall mean (i) has been convicted of an act constituting a misdemeanor involving moral turpitude or has committed a felony under the laws of the United States or any state or political subdivision thereof or any other jurisdiction; (ii) has committed an act constituting a breach of fiduciary duty, gross negligence or willful misconduct; (iii) has engaged in conduct which constitutes a material violation of the Corporation's then existing internal policies or procedures and which is detrimental to the business, reputation, character or standing of the Corporation or any of its affiliates; (iv) has committed an act of fraud, theft or embezzlement; (v) has participated in a dishonest scheme, misrepresentation or conspiracy that is detrimental to the business, reputation, character or standing of the Corporation or any of its affiliates; (vi) has engaged in self-dealing; (vii) has materially breached his obligations as set forth in this Agreement or his employment agreement or has materially neglected or failed to satisfactorily perform his duties and responsibilities as an employee or executive of the Corporation; (viii) has become bankrupt or insolvent; or (ix) has been repeatedly or continuously absent from the Corporation without the permission of the Corporation's Board of directors for reasons unrelated to health, disability or death.

    (b)    "<u>Credit Agreement</u>" means that certain Loan and Security Agreement dated as of November 24, 2006 as may be amended, by and between LaSalle Business Credit, LLC, the Corporation and the other financial institutions referenced therein, and any replacement or substitute loan agreement(s) executed by the Corporation in connection with any refinancing of the indebtedness outstanding under the Credit Agreement or other senior financing of the Corporation.

    (c)    "<u>Fair Market Value</u>" means the price per share as determined in the sole discretion of the Corporation's Board of Directors (including a private company liquidity discount) based on a reasonable multiple for a private company of trailing earnings before interest, taxes, depreciation and amortization less any outstanding indebtedness or some other measurement that the Board of Directors determines is reasonable.

    (d)    "<u>Good Reason</u>" means a material change in the Shareholder's salary or title.

HHI20368

(e)   "Sale Event" means a sale of a majority of the Corporation's assets, or any merger, consolidation or other transaction of the Corporation with or into another corporation, entity or person, other than a transaction in which the holders (or any affiliate of such holders) of at least a majority of the shares of the Corporation outstanding capital stock immediately prior to such transaction continue to hold (either by the voting securities remaining outstanding or by their being converted into voting securities of the surviving entity) the largest percentage of the total voting power represented by the voting securities of the Corporation, or such surviving entity, outstanding immediately after such transaction.

## ARTICLE III

### Withholding

3.1   Withholding.  If the Corporation shall be required to withhold amounts under applicable federal, state or local tax laws, rules or regulations, the Corporation shall be entitled, at its option, to (i) deduct and withhold such amounts from any cash payment to be made by the Corporation to the Minority Shareholder or to such other person with respect to whom such withholding may arise; or (ii) require the Minority Shareholder (or such other person) to make payment to the Corporation in such amount as is required to be withheld.

## ARTICLE IV

### Legend on Certificates

4.1   Legend on Certificates.  (a) The Minority Shareholder and the Corporation agree to cause a legend in substantially the form set forth below, to be conspicuously noted on the face or reverse of all certificates representing any of the Shares presently owned by the Minority Shareholder or which may hereafter be issued during the term of this Agreement:

> This Certificate and all rights thereby represented are subject to all of the terms, provisions and conditions of a certain Shareholders' Agreement made and entered into as of the 24th day of November 2006, and any amendments thereto, by and among this Corporation and the Minority Shareholder named therein, and may not be sold, assigned, transferred, pledged, hypothecated or in any manner whatsoever disposed of or encumbered except in accordance with the terms and provisions of said Agreement, a copy of which is on file and available for inspection at the office of the Corporation.

(b)   The Corporation and the Minority Shareholder will use its and their best efforts to prevent the issuance by the Corporation of the Shares or additional shares of the Corporation's Common Stock unless the foregoing, or similar, legend shall be conspicuously noted on the certificate. Any person, who in the future owns any of the Shares, as a condition to the receipt of such stock, must agree to be bound by and to execute this Agreement.  A copy of this Agreement shall at all times be kept in the principal office of the Corporation.

HHI20369

# ARTICLE V

## Term of Agreement

5.1     Term of Agreement. This Agreement and all restrictions on the Shares created hereby shall commence on the date hereof and shall terminate on the occurrence of any of the following events: (a) a single shareholder becoming the owner of all of the outstanding shares of the Corporation; (b) a public offering of the Corporation's common stock pursuant to a registration statement declared effective under the Securities Act; (c) the execution of a written instrument by the Corporation and all persons who then own shares of the Corporation's common stock, subject to this Agreement or a similar agreement, which terminates the same; or (d) the liquidation and dissolution of the Corporation.

# ARTICLE VI

## Miscellaneous

6.1     Binding on Succ     .s. This Agreement shall be binding upon and inure to the benefit of the Corporation a     its successors, the Minority Shareholder and the Minority Shareholder's permitted transferees. The Corporation may assign all of its rights hereunder. The Minority Shareholder by the signing hereof, directs the Minority Shareholder's legal representatives, where applicable, to open their estates promptly in the courts of proper jurisdiction and to execute, procure and deliver all documents including, but not limited to, appropriate court orders, letters testamentary or letters of administration and estate and inheritance tax waivers, as shall be required to effectuate the purposes of this Agreement. Except as otherwise expressly provided herein, nothing contained herein shall confer or is intended to confer on any third party or entity which is not a party to this Agreement any rights under this Agreement.

6.2     New S     holders. To become a party to this Agreement, a shareholder shall execute a Subscription Agreement and a joinder agreement substantially in the form of Exhibit D attached hereto (a "Joinder Agreement") which the Corporation shall countersign. A Joinder Agreement duly executed by such shareholder and countersigned by the Corporation shall be sufficient for all purposes to cause such shareholder to become a party hereto, and it shall not be necessary to obtain the signature of any other shareholders on or in connection with such     inder Agreement. Notwithstanding anything herein to the contrary, the Corporation shall be entitled to execute Joinder Agreements, or other shareholder agreements, with any other shareholder of the Corporation with terms different than the terms of this Agreement, as the Corporation shall deem advisable.

6.3     Entire Agreement; Amendments. This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof. This Agreement cannot be changed or terminated orally. This Agreement may be amended, the parties may take any action herein prohibited or omit to take action herein required to be performed by them, and any breach of or compliance with any covenant, agreement, warranty or representation may be waived, only if the written consent or waiver is obtained from the Corporation.

DC01 460026.1                                   6

HHI20370

    6.4    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to principles of conflicts of law.

    6.5    <u>Severability</u>. In the event that anyone or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement and this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been contained herein.

    6.6    <u>Notices</u>. All notices, statements and other communications provided for by this Agreement shall be in writing and shall be deemed to have been given when actually delivered to the party to which notice is given when hand delivered, when received if sent by telecopier or by same day or overnight recognized commercial courier service or when mailed postage paid by registered or certified mail, return receipt requested, addressed to the party to which notice is given at its address on file with the Corporation or at its address set forth in a notice given by such party in accordance with the provisions hereof; provided, however, that any notice of change of address shall be effective only upon receipt.

    6.7    <u>Waivers</u>. A waiver on the part of any of the parties hereto of any term, provision or condition of this Agreement or breach thereof shall not constitute a precedent, nor bind any party hereto to a waiver of any other term, provision or condition of this Agreement or any other or succeeding breach of the same or any other term, provision or condition hereof.

    6.8    <u>Investment Representation</u>. The Minority Shareholder hereby warrants and represents that he is acquiring the number of Shares purchased by the Minority Shareholder for investment only and not with a view to the sale or distribution thereof.

    6.9    <u>Pronouns</u>. Whenever the context requires, the use in this Agreement of a pronoun of any gender shall be deemed to refer also to any other gender, and the use of the singular shall be deemed to refer also to the plural.

    6.10    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be an original but all of which shall be deemed one and the same instrument.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

HHI20371

IN WITNESS WHEREOF, the parties hereto have executed this Shareholders' Agreement as of the day and year first above written.

HOUSTON HARVEST, INC.

Name: Laurence Bey
Title: VP

MINORITY SHAREHOLDER

_____

Brett Glass

HHI20372

IN WITNESS WHEREOF, the parties hereto have executed this Shareholders'
Agreement as of the day and year first above written.

HOUSTON HARVEST, INC.

_____
Name:
Title:

MINORITY SHAREHOLDER

_____
Brett Glass

HHI20373

## EXHIBIT A

## SUBSCRIPTION AGREEMENT

1.    <u>Subscription</u>. Subject to the terms and conditions hereof, the undersigned (the "<u>Subscriber</u>") irrevocably subscribes for and agrees to purchase one hundred ten (110) shares (the "<u>Shares</u>") of Houston Harvest, Inc., a Delaware corporation (the "<u>Corporation</u>") common stock, $.01 par value per share ("<u>Common Stock</u>"), for the aggregate purchase price of One Hundred Ten Thousand Dollars ($110,000) (the "<u>Purchase Price</u>"). The Subscriber shall deliver to the Corporation full payment of the Purchase Price on the date hereof or as otherwise directed by the Corporation. Following receipt by the Corporation of the Purchase Price, the Corporation shall issue to the Subscriber one or more certificates representing the Shares. The right of the Subscriber to purchase and/or receive the Shares subscribed for hereunder is subject to the Subscribers' execution and delivery of a Shareholders' Agreement to which this Subscription Agreement (this "<u>Subscription Agreement</u>") is a part. In addition, the Subscriber shall complete the Subscriber Information Sheet annexed hereto and represents that the information provided therein is accurate and complete.

2.    <u>Subscriber Representations, Warranties and Covenants</u>. The Subscriber represents and warrants to, and agrees with, the Corporation as follows:

(a)    the Subscriber is acquiring the Shares for the Subscriber's own account as principal for investment and not with a view to the distribution or sale thereof;

(b)    the Subscriber has sufficient knowledge and experience in financial and business matters to evaluate the merits and risks of this investment;

(c)    the Subscriber has no need for liquidity in this investment, has the ability to bear the economic risk of this investment, and at the present time and in the foreseeable future can afford a complete loss of this investment;

(d)    the Subscriber has reviewed the summary of the definition of an "accredited investor" as used in Regulation D promulgated under the Securities Act of 1933, as amended (the "<u>Securities Act</u>") and confirms that the Subscriber is an "accredited investor" (as such term is defined in the Subscriber Information Sheet);

(e)    the Subscriber is aware that (1) no federal or state agency has passed upon the Shares or made any finding or determination as to the fairness of this investment, (2) there are substantial risks incident to the purchase of the Shares, (3) there are substantial restrictions on the transferability of the Shares, (4) there is no established market for the Shares and no public market for the Shares is likely to develop, (5) the Shares will not be, and investors in the Corporation have no rights to require that the Shares be, registered under the Securities Act or state securities laws and therefore the Shares cannot be resold, pledged, assigned or otherwise disposed of unless subsequently registered or unless an exemption from such registration is available, and (6) the Subscriber may have to hold the Shares herein subscribed for and bear the economic risk of this investment indefinitely and it may not be possible for the Subscriber to liquidate its investment in the Corporation;

HHI20374

(f)    the Subscriber has carefully reviewed any written information provided to the Subscriber by or on behalf of the Corporation in connection with this Subscription Agreement, acknowledges that no representations or warranties have been made to the Subscriber concerning the Shares or the Corporation and confirms that all requested documents pertaining to the Subscriber's investment in the Corporation have been made available to the Subscriber and/or its representatives;

(g)    the Subscriber, and/or the Subscriber's advisors, have had the opportunity to ask questions of, and receive answers from, directors and officers of the Corporation. or a person acting on its behalf, concerning the terms of an investment in the Corporation and to receive additional information, to the extent that the Corporation possessed such information or was able to acquire it without unreasonable effort or expense, which the Subscriber or its advisors deemed necessary to evaluate such investment;

(h)    the Subscriber, in making the decision to purchase the Shares, has relied upon independent investigations made by the Subscriber and not on the officers or directors of the Corporation, the Corporation, or any person or entity other than the Subscriber's own advisors with respect to the legal, tax and other considerations of the Subscriber relating to such investment;

(i)    all information which the Subscriber has provided to the Corporation and its representatives concerning the Subscriber is true, complete and correct;

(j)    the Subscriber has full right, power, authority and capacity to enter into this Subscription Agreement and to purchase the Shares;

(k)    if the Subscriber is a corporation, partnership or trust, it is authorized and otherwise duly qualified to purchase and hold the Shares, it has its principal place of business as set forth herein and it has not been formed for the specific purpose of acquiring the Shares unless all of its equity owners qualify as accredited investors, and the individual signing this Subscription Agreement is duly authorized to do so;

(l)    this Subscription Agreement constitutes a valid and binding obligation of the Subscriber, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' and contracting parties' rights generally and except as limited by general principles of equity and except to the extent that the indemnification agreement of the Subscriber in Section 4 hereof may be legally unenforceable;

(m)    if the Subscriber is a corporation, partnership or trust, and if the Subscriber, by virtue of the Shares subscribed for hereby, would own more than 10% of the aggregate of the Common Stock as of the date of the acquisition of the Subscriber's Shares, either (1) all the Subscriber's outstanding securities (as such term is defined in the Investment Company Act of 1940, as amended, the "1940 Act") are beneficially owned by one natural person or (2) the value of all securities (other than short-term paper, as defined in the 1940 Act) owned by such Subscriber of all issuers which are or would, but for the exception set forth in subparagraph (A) of Section 3(c)(1) of the 1940 Act, be excluded from the definition of "investment company" under the 1940 Act solely by Section 3(c)(1) of the 1940 Act does not exceed 10% of the value of the Subscriber's total assets;

DOD #45000C ·

(n)    the Subscriber agrees to deliver to the Corporation such other ormation as to certain matters under the Securities Act and the 1940 Act as the ..rporation may reasonably request in order to ensure compliance with such Acts and the availability of any exemption thereunder; and

(o)    if the Subscriber is a corporation, partnership or trust, and if all or part of the funds that the Subscriber is using to purchase the Shares are assets of an employee benefit plan as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or a plan described in Section 4975(e)(1) of the Internal Revenue Code of 1986 (the "Code"), (1) the funds so constituting plan assets have been identified to the Corporation (2) its proposed purchase of the Shares is permissible under the documents governing the investment of such plan assets, (3) in making the proposed purchase of the Shares, it is aware of and has taken into consideration the diversification requirements of Section 404(a)(1) of ERISA and the decision to invest plan assets in the Corporation is consistent with the provisions of ERISA or other applicable law that require diversification in the investment of plan assets, and (4) it has concluded that the proposed purchase of the Shares is prudent and is consistent with other applicable fiduciary responsibilities under ERISA or other applicable law.

3.    Indemnification. The Subscriber agrees to indemnify and hold harmless the Corporation, its directors and officers, each affiliate of the foregoing, and each other person, if any, who controls the Corporation or any of the foregoing entities within the meaning of Section 15 of the Securities Act from and against any and all damages, losses, liabilities, claims, costs and expenses whatsoever (including reasonable attorneys' fees) which they may incur (a) by reason of the failure of the Subscriber to fulfill any of the terms or conditions of this Subscription Agreement, or (b) by reason of any breach of the representations and warranties made by the Subscriber herein or in any document provided by the Subscriber to the Corporation or its officers or directors.

4.    Issuance and Sale. The Corporation represents and warrants to the Subscriber that the issuance and sale of the Shares have been duly authorized by all requisite corporate action. All of the Shares to be issued to the Subscriber pursuant to this Subscription Agreement, as and when issued in accordance with this Subscription Agreement and upon payment by the Subscriber of the purchase price therefore, will be validly issued and outstanding and fully paid and non-assessable.

5.    Modification. Neither this Subscription Agreement nor any provision hereof shall be waived, modified, discharged or terminated except by an instrument in writing signed by the party against whom such waiver, modification, discharge or termination is sought to be enforced.

6.    Notices. All notices, consents, requests, demands, offers, reports, and other communications required or permitted to be given pursuant to this Subscription Agreement shall be in writing and shall be considered properly given and received when personally deliver ' to the party entitled thereto, or when sent by facsimile or by overnight courier, or seven ( ') business days after being sent by certified United States mail, return receipt requested, in a sealed envelope, with postage prepaid, addressed to the Corporation c/o the Chief Executive Officer, and, if to the Subscriber, to the address set forth below the Subscriber's signature on the counterpart of this Subscription Agreement which the

HHI20376

Subscriber originally executed and delivered to the Corporation. The Corporation or the Subscriber may change its address by giving notice to the other.

7.    Counterparts.  This Subscription Agreement may be executed in multiple counterpart copies, each of which shall be considered an original and all of which constitute one and the same instrument binding on all the parties, notwithstanding that all parties are not signatories to the same counterpart.

8.    Successors. Except as otherwise provided herein, this Subscription Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, executors, administrators, successors, trustees and legal representatives. If the Subscriber is more than one person, the obligation of the Subscriber shall be joint and several and the agreements, representations, warranties, and acknowledgements herein contained shall be deemed to be made by and be binding upon each such person and such person's heirs, executors, administrators, successors, trustees and legal representatives.

9.    Assignability. This Subscription Agreement is not transferable or assignable by the Subscriber.  Any purported assignment of this Subscription Agreement by the Subscriber shall be null and void.

10.    Entire Agreement.   This Subscription Agreement contains the entire agreement of the parties with respect to the subject matter hereof and supersedes all other prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof.

11.    Applicable Law.  This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

12.    Survival.  The provisions of Sections 2 and 3 hereof shall survive the consummation of the sale of the Shares and any dissolution of the Corporation.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

HHI20377

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement as of the __ day of November 2006.

SUBSCRIBER

_____

Brett Glass

SUBSCRIPTION ACCEPTED

HOUSTON HARVEST, INC.

_____

Name:
Title:

DC01:460026 1

HHI20378

## SUBSCRIBER INFORMATION SHEET

Name of Subscriber: _____

Address: _____

           _____

           _____

Telephone Number: _____

Taxpayer Identification No. or Social Security No.: _____

The Subscriber is ____ OR is **not** ____ (Check appropriate response) subject to backup withholding under the provisions of Section 3406(a)(I)(c) of the Code.

TYPE OF OWNERSHIP – Check one:

_____ INDIVIDUAL OWNERSHIP (One signature required.)

_____ JOINT TENANTS WITH RIGHT OF SURVIVORSHIP (all parties must sign a signature page)

_____ PARTNERSHIP (Signature of general partner and additional signatures if required by the partnership agreement. Please include a copy of the partnership agreement and any other document authorizing signatory to enter into and execute this Agreement on behalf of such partnership.)

_____ TENANTS IN COMMON (All parties must sign a signature page)

_____ CORPORATION (signature of authorized party or parties. Please include certified corporate resolution empowering signatory to enter into and execute this Agreement on behalf of such corporation.)

_____ TRUST (Signature of trustee and additional signatures if required by the trust agreement. Please provide copy of trust instrument.)

If the Subscriber is an entity:

Nature of Business: _____

Date and Jurisdiction of Formation: _____

Number of Equity Holders: _____

Principal Place of Business (if other than address set forth above): _____

HHI20379

"Accredited investor" includes:

(1)    Any business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(2)    Any director or executive officer of the Corporation;

(3)    Any natural person whose individual net worth, or joint net worth with that person's spouse at the time of his purchase exceeds $1,000,000;

(4)    Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(5)    Any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a person who has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment; and

(6)    Any entity in which all of the equity owners are accredited investors.

DC01:460026.1

HHI20380

## EXHIBIT B

## NON-SOLICITATION, NON-COMPETITION
### AND
## CONFIDENTIALITY AGREEMENT

THIS     NON-SOLICITATION,     NON-COMPETITION     AND
CONFIDENTIALITY AGREEMENT (this "Agreement") is made and entered into this
____ day of November, 2006, by and between Houston Harvest, Inc, a Delaware corporation
(the "Company") and Brett Glass (the "Shareholder"). Any capitalized term used but not
defined herein shall have the meaning ascribed thereto in the Shareholders' Agreement (as
defined below).

## RECITALS

1.   Pursuant to the Shareholders' Agreement (the "Shareholders' Agreement") to
which this Agreement is a part, and the Subscription Agreement executed in
connection therewith, the Company has issued to Shareholder one hundred ten
(110) shares of the Company's common stock (the "Shares").

2.   Shareholder is an employee and/or officer, director, consultant or affiliate of
Milestone (as defined in the Shareholders' Agreement) and possesses valuable
knowledge about the Company and has expertise and experience in the
business of operating, manufacturing, distributing and selling food products.

3.   The Company desires to protect its business investment by requiring
Shareholder to enter into this Agreement.

4.   Shareholder agrees that, in consideration for the issuance of the Shares, for
Shareholder's continued employment and/or affiliation with the Company
and/or Milestone and for the knowledge Shareholder will obtain concerning
the Company's confidential business information, to enter into this
Agreement.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency of
which is hereby acknowledged, the Company and the Shareholder, intending to be legally
bound, agree as follows:

1.   Non-Solicitation.   While employed or associated with the Company or
Milestone or any affiliate or related party of the Company or Milestone and for a period of
four (4) years after termination of such employment or affiliation for any reason, voluntary or
involuntary, Shareholder will not, except with prior written approval of the Company and
Milestone, directly or indirectly, individually or as part of or on behalf of any other person,
company, employer or other entity (i) solicit or attempt to solicit any employee of the
Company to end his/her relationship with the Company, (ii) hire, attempt to hire, or assist
anyone else in hiring or attempting to hire anyone who is at that time employed by the
Company or Milestone or has been employed by the Company or Milestone during the 90
days preceding such hiring or attempt to hire, or (iii) solicit any consultant, contractor, vendor
or customer of the Company to diminish or materially alter its relationship with the Company

HHI20381

or Milestone. Notwithstanding anything herein to the contrary, nothing herein shall prohibit the Shareholder from soliciting customers of the Company to sell them products provided such products do not compete with past, current or planned products of the Company at the time of departure and in no way do such solicitations induce the customer to direct business away from the Company or diminish the amount of business it pursues with the Company. In addition, for purposes of clarification, nothing herein shall prohibit the Shareholder from soliciting vendors of the Company as long as such solicitations do not in any way induce the vendors to direct business away from the Company or diminish the amount of business it pursues with the Company.

2.    <u>Agreements Regarding Non-Competition and Non-Interference.</u>

2.1    <u>Nature of Shareholder's Duties.</u>  The Shareholder acknowledges that: (a) the main thrust of the Company's business is national in scope and its sites are located throughout the United States; (b) the Company competes with other businesses that are or could be located in any part of the United States; (c) the Company has required that the Shareholder make the agreements in <u>Section 2.2</u> as a condition to the purchase of the Shares; and (d) the provisions of <u>Section 2.2</u> are reasonable and necessary to protect the Company's business.  Shareholder further acknowledges that the provisions of <u>Section 2.2</u> are necessary to protect the Company's legitimate business interests and warrants that these provisions will not unreasonably interfere in Shareholder's ability to earn a living or to pursue his occupation after the employment termination date.

2.2    <u>Non-Competition.</u>  The Shareholder agrees that he will not, directly or indirectly for a period ending three (3) years after the date the Shareholder's employment or association with the Company or Milestone is terminated, with or without Cause (as defined in the Shareholders' Agreement) or by the Shareholder for any reason (the "Noncompetition Period"), unless otherwise consented to by the Company and Milestone: (1) engage or invest in, own, manage, operate, or finance or participate in the ownership, management, operation or financing of a Competing Business (as defined below); (2) be employed by or associated with a Competing Business; or (3) lend the Shareholder's name or credit to or render services or advice to a Competing Business; *provided, however,* that the Shareholder may purchase or otherwise acquire up to five percent (5%) of any class of securities of any enterprise, without otherwise participating in the activities of such enterprise, if such securities have been registered under Section 12(b) or 12(g) of the Securities Exchange Act of 1934.  As used herein, the term "Competing Business" means any company engaged in the manufacture, marketing, distribution and/or sale of seasonal and non seasonal food gift and related food gift products and/or the manufacture of popcorn for seasonal gifts, popcorn tins and any related products.

2.3    <u>Non-Disparagement.</u>  The Shareholder agrees that he will not, directly or indirectly, at any time during or after the Noncompetition Period, disparage the Company, Milestone, or any of its or their shareholders, directors, officers, members, partners, employees or agents.  The Company also agrees that it will use reasonable efforts not to disparage the Shareholder to any outside parties or individuals, however, nothing herein shall prohibit the Company's ability to explain the nature of the Shareholder's departure to customers, vendors and/or employees or to respond to appropriate courts of law.

HHI20382

2.4    Severability and Reduction of Scope of Agreements.  If any agreement in Section 2.2 is held to be unreasonable, arbitrary, or against public policy, such agreement will be considered to be divisible with respect to scope, time, and geographic area, and such lesser scope, time, or geographic area, or all of them, as a court of competent jurisdiction may determine to be reasonable, not arbitrary, and not against public policy, will be effective, binding, and enforceable against the Shareholder.

3.    Confidential Information.

3.1    Protection of Confidential Information; Reasonableness.  The Shareholder acknowledges and agrees that (a)  the Shareholder has been afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information will have an adverse effect on the Company and its business; (c) the Company has required that the Shareholder make the agreements in Section 3.2 as a condition to the execution of the Shareholders Agreement and (d) the provisions of Section 3.2 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information.  For purposes of this Agreement, "Confidential Information" means any and all proprietary information concerning the business of the Company, including: (1) business plans; (2) historical and projected financial information and budgets; (3) customer lists and information, price lists and market studies; (4) ideas, techniques, designs, modifications, processes, and improvements; (5) employee training and techniques and materials; (6) personnel information, including, but not limited to the names, background, compensation, benefits, addresses and phone numbers of employees; (7) trade secrets and other proprietary information; and (8) notes, analysis, compilations, studies, summaries, specifications, data, processes, designs, photographs, illustrations, graphs and samples related to any of the foregoing.

3.2    Agreements Regarding Confidential Information.  The Shareholder represents and warrants that, prior to the date of this Agreement, Shareholder has held in strict confidence all Confidential Information and has not used it for any purpose, except as expressly authorized by the Company.  The Shareholder agrees as follows:

(a)    The Shareholder will not disclose or use any Confidential Information except (1) with the specific prior written consent of the Company; (2) after any such information becomes generally publicly known in a manner unrelated to the any act or omission of the Shareholder; and (3) in response to compulsory legal process that requires disclosure of such information, provided that the Shareholder has complied with the following procedures: (i) the Shareholder immediately delivers a copy of such process to the Company and (ii) the Shareholder does not disclose any information until the last day indicated in the legal process or, if the Company timely and properly objects to the disclosure and notifies the Shareholder that it has made such objections, only when and if such objections have been overruled.

(b)    The Shareholder will hold all Confidential Information in strict confidence and take all steps necessary and reasonable to safeguard any document, record, plan, model, component, device, computer software or source code, or any other item containing Confidential Information, however documented (collectively, the "Proprietary Items").  The Shareholder recognizes that all of the Proprietary Items are the exclusive property of the Company.

DCIIL-460026-1

HHI20383

3.3    Disputes and Controversies. The Shareholder recognizes that should a dispute or controversy arising from or relating to this Agreement be submitted for adjudication to any court, arbitration panel, or other third party, the preservation of the secrecy of Confidential Information may be jeopardized. All pleadings, documents, testimony, and records relating to any such adjudication will be maintained in secrecy and will be available for inspection by designated representatives, attorneys and experts of the Company and of the Shareholder, who will agree, in advance and in writing, to receive and maintain all such information in secrecy, except as the parties may otherwise agree in writing.

4.    Miscellaneous.

4.1    Injunctive Relief and Additional Remedies. The Shareholder acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement, including any provision of Sections 1, 2.2 or 3.2, would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement.

4.2    Essential and Independent Agreements. The agreements by the Shareholder in Sections 1, 2.2, 3.1 and 3.2 are essential elements of this Agreement, and without the Shareholder's agreement to Sections 1, 2.2, 3.1 and 3.2, the Company would not have entered into this Agreement or the Subscription Agreement and Shareholder would not have entered into the Subscription Agreement or agree to be bound by its terms. The Company and the Shareholder have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such agreements, with specific regard to the nature of the business conducted by the Company.

4.3    Binding Effect; Delegation of Duties Prohibited. This Agreement shall inure to the benefit of, and shall be binding upon, the Company and its successors, assigns and legal representatives, including any entity with which the Company may merge or consolidate or to which all or substantially all of its assets may be transferred. The duties and covenants of the Shareholder under this Agreement, being personal, may not be delegated or assigned, but shall be binding upon the heirs and legal representatives of the Shareholder.

4.4    Notices. All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand with written confirmation of receipt, (b) sent by facsimile with written confirmation of receipt, provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service with written confirmation of receipt, in each case to the appropriate addresses and facsimile numbers set forth on the signature page or to such other addresses and facsimile numbers as a party may designate by notice to the other parties.

4.5    Entire Agreement; Amendments. With respect to the subject matter hereof, this Agreement contains the entire agreement between the parties and supersede all prior agreements and understandings, oral or written, between or among the parties hereto and/or Milestone Capital Management I, LLC with respect to the subject matter hereof, including, but not limited to the "Restrictive Covenant" section of the letter agreement, dated November 6, 2006, by and between the Shareholder and Milestone Capital Management I, LLC. This

DC01:460026.1

HHI20384

Agreement may not be amended orally, but only by an agreement in writing signed by each of the parties hereto.

     4.6    <u>Governing Law</u>.  This Agreement will be governed by the laws of the State of Delaware without regard to conflicts of laws principles.

     4.7    <u>Severability</u>.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

     4.8    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

*[Remainder of Page Intentionally Left Blank]*

DC01:460076 t

HHI20385

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date above first written above.

THE COMPANY:

_____
Name:
Title:

Notice Address:

Houston Harvest, Inc.
Attention: Chief Executive Officer
3501 Mt. Prospect Rd., Franklin Park, IL 60131

SHAREHOLDER:

_____
Brett Glass

Notice Address:

_____
_____
_____
_____

HHI20386

<u>EXHIBIT C</u>

Letter Agreement

[Date]

Shareholder
Address

     Re:   <u>Resignation and Stock Repurchase Agreement</u>.

Dear _____:

Reference is hereby made to the following agreements to which you and Houston Harvest, Inc., a Delaware corporation (the "Company") are a party: (i) the Shareholders Agreement dated as of _____(the "SHA"), (ii) the Subscription Agreement attached to the SHA and (iii) the Non-Solicitation, Non-Competition and Confidentiality Agreement attached to the SHA (the "Non-Competition Agreement").

You have [informed Milestone (as defined in the SHA) that you are voluntarily resigning your employment with Milestone][been terminated] effective immediately and, as a result, in accordance with Section [2.1][2.2] of the SHA you are required, upon demand, to sell the Shares (as defined below) purchased by you back to the Company in exchange for the Company's payment to you of the [purchase price paid for the Shares or the Fair Market Value (as defined in the SHA) of the Shares or $_____ (the "FMV Price")]. In accordance with the SHA, you purchased _____ shares of the Company's common stock (the "Shares") for an aggregate purchase price of $_____ (the "Purchase Price"). The Company hereby demands to repurchase the Shares for the [Purchase Price] [FMV Price].

In accordance with the forgoing, the Company, upon execution hereof, and the return from you of the certificates representing the Shares, shall pay to you the above amount by check or wire transfer. All of the certificates evidencing the Shares shall immediately be, and hereby are, cancelled. Upon payment of the amount above, you forever release and forfeit any and all rights or claims to any other benefits, interests or payments of any kind or nature which may have been due to you from, the Company, Milestone or any of its or their affiliates. Except as set forth herein, you are not entitled to any payments and/or benefits from the Company or Milestone of any kind and you fully and forever release the Company and Milestone, and each of their affiliates, successors, assigns, officers, directors, members, partners, employees, agents and representatives from and against any and all claims, causes of action, costs, fees, damages, derivate claims, controversies and demands of any kind or nature, whether known or unknown, either in law or in equity.

Upon your departure, the terms and conditions of the Non-Competition Agreement shall remain in full force in effect in accordance with their terms.

The terms of this Letter Agreement are to be held strictly confidential. This Letter Agreement may be executed in as many counterparts as may be deemed necessary or convenient, and by the different parties hereto on separate counterparts, each of which, when so executed, shall

HHI20387

be deemed an original, but all such counterparts shall constitute but one and the same instrument.

This Letter Agreement shall be governed in accordance with Delaware law and shall only be effective upon the execution of each party hereto and the cancellation of the certificates representing the Shares.

Sincerely,

HOUSTON HARVEST, INC.

Name: _____

Title: _____

AGREED AND ACCEPTED AS OF THE DATE SET FORTH BELOW:

Name: _____

Date: _____

HHI20388

**EXHIBIT D**

**FORM OF**
**JOINDER AGREEMENT**

Attention: President

Dear _____:

In consideration of the issuance to the undersigned (the "New Shareholder") of _____ shares of Common Stock, par value $.01 per share, of Houston Harvest, Inc., a Delaware corporation (the "Company"), the undersigned [represents that it is a Permitted Transferee of [Insert name of transferor] and]* agrees that, as of the date written below, [he] [she] [it] shall become a party to that certain Shareholders Agreement dated as of _____ as such agreement may have been amended from time to time (the "Shareholders' Agreement"), among the Company and the persons named therein, and the New Shareholder, [as a Permitted Transferee]*, shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Shareholders' Agreement [that were applicable to the undersigned's transferor]* and shall be deemed a Minority Shareholder for all purposes thereof [describe exceptions, if any].

Executed as of the _day of _____, 20__

TRANSFEREE: _____

Address:_____

       _____

       _____

ACKNOWLEDGED AND ACCEPTED

COMPANY

       _____

Name:_____

Title: _____

*Include if transferee is a permitted transferee.

3909638v2

HHI20389

## NON-SOLICITATION, NON-COMPETITION
### AND
### CONFIDENTIALITY AGREEMENT

**THIS NON-SOLICITATION, NON-COMPETITION AND CONFIDENTIALITY AGREEMENT** (this "Agreement") is made and entered into this 24ᵗʰ day of November, 2006, by and between Houston Harvest, Inc, a Delaware corporation (the "Company") and Brett Glass (the "Shareholder"). Any capitalized term used but not defined herein shall have the meaning ascribed thereto in the Shareholders' Agreement (as defined below).

### RECITALS

1.  Pursuant to the Shareholders' Agreement (the "Shareholders' Agreement") to which this Agreement is a part, and the Subscription Agreement executed in connection therewith, the Company has issued to Shareholder one hundred ten (110) shares of the Company's common stock (the "Shares").

2.  Shareholder is an employee and/or officer, director, consultant or affiliate of Milestone (as defined in the Shareholders' Agreement) and possesses valuable knowledge about the Company and has expertise and experience in the business of operating, manufacturing, distributing and selling food products.

3.  The Company desires to protect its business investment by requiring Shareholder to enter into this Agreement.

4.  Shareholder agrees that, in consideration for the issuance of the Shares, for Shareholder's continued employment and/or affiliation with the Company and/or Milestone and for the knowledge Shareholder will obtain concerning the Company's confidential business information, to enter into this Agreement.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Company and the Shareholder, intending to be legally bound, agree as follows:

1.  **Non-Solicitation.** While employed or associated with the Company or Milestone or any affiliate or related party of the Company or Milestone and for a period of four (4) years after termination of such employment or affiliation for any reason, voluntary or involuntary, Shareholder will not, except with prior written approval of the Company and Milestone, directly or indirectly, individually or as part of or on behalf of any other person, company, employer or other entity (i) solicit or attempt to solicit any employee of the Company to end his/her relationship with the Company, (ii) hire, attempt to hire, or assist anyone else in hiring or attempting to hire anyone who is at that time employed by the Company or Milestone or has been employed by the Company or Milestone during the 90 days preceding such hiring or attempt to hire, or (iii) solicit any consultant, contractor, vendor or customer of the Company to diminish or materially alter its relationship with the Company or Milestone. Notwithstanding

DC01:460056.1                                    1



Exhibit B

HHI22761

anything herein to the contrary, nothing herein shall prohibit the Shareholder from soliciting customers of the Company to sell them products provided such products do not compete with past, current or planned products of the Company at the time of departure and in no way do such solicitations induce the customer to direct business away from the Company or diminish the amount of business it pursues with the Company.   In addition, for purposes of clarification, nothing herein shall prohibit the Shareholder from soliciting vendors of the Company as long as such solicitations do not in any way induce the vendors to direct business away from the Company or diminish the amount of business it pursues with the Company.

2.    Agreements Regarding Non-Competition and Non-Interference.

2.1    Nature of Shareholder's Duties.  The Shareholder acknowledges that: (a) the main thrust of the Company's business is national in scope and its sites are located throughout the United States; (b) the Company competes with other businesses that are or could be located in any part of the United States; (c) the Company has required that the Shareholder make the agreements in Section 2.2 as a condition to the purchase of the Shares; and (d) the provisions of Section 2.2 are reasonable and necessary to protect the Company's business.  Shareholder further acknowledges that the provisions of Section 2.2 are necessary to protect the Company's legitimate business interests and warrants that these provisions will not unreasonably interfere in Shareholder's ability to earn a living or to pursue his occupation after the employment termination date.

2.2    Non-Competition.  The Shareholder agrees that he will not, directly or indirectly for a period ending three (3) years after the date the Shareholder's employment or association with the Company or Milestone is terminated, with or without Cause (as defined in the Shareholders' Agreement) or by the Shareholder for any reason (the "Noncompetition Period"), unless otherwise consented to by the Company and Milestone: (1) engage or invest in, own, manage, operate, or finance or participate in the ownership, management, operation or financing of a Competing Business (as defined below); (2) be employed by or associated with a Competing Business; or (3) lend the Shareholder's name or credit to or render services or advice to a Competing Business; provided, however, that the Shareholder may purchase or otherwise acquire up to five percent (5%) of any class of securities of any enterprise, without otherwise participating in the activities of such enterprise, if such securities have been registered under Section 12(b) or 12(g) of the Securities Exchange Act of 1934.  As used herein, the term "Competing Business" means any company engaged in the manufacture, marketing, distribution and/or sale of seasonal and non seasonal food gift and related food gift products and/or the manufacture of popcorn for seasonal gifts, popcorn tins and any related products.

2.3    Non-Disparagement. The Shareholder agrees that he will not, directly or indirectly, at any time during or after the Noncompetition Period, disparage the Company, Milestone, or any of its or their shareholders, directors, officers, members, partners, employees or agents.  The Company also agrees that it will use reasonable efforts not to disparage the Shareholder to any outside parties or individuals, however, nothing herein shall prohibit the Company's ability to explain the nature of the Shareholder's departure to customers, vendors and/or employees or to respond to appropriate courts of law.

DC01:460056.1

2

HHI22762

2.4    <u>Severability and Reduction of Scope of Agreements</u>.  If any agreement in <u>Section 2.2</u> is held to be unreasonable, arbitrary, or against public policy, such agreement will be considered to be divisible with respect to scope, time, and geographic area, and such lesser scope, time, or geographic area, or all of them, as a court of competent jurisdiction may determine to be reasonable, not arbitrary, and not against public policy, will be effective, binding, and enforceable against the Shareholder.

3.    <u>Confidential Information</u>.

3.1    <u>Protection of Confidential Information; Reasonableness</u>.  The Shareholder acknowledges and agrees that (a) the Shareholder has been afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information will have an adverse effect on the Company and its business; (c) the Company has required that the Shareholder make the agreements in <u>Section 3.2</u> as a condition to the execution of the Shareholders Agreement and (d) the provisions of <u>Section 3.2</u> are reasonable and necessary to prevent the improper use or disclosure of Confidential Information.   For purposes of this Agreement, "<u>Confidential Information</u>" means any and all proprietary information concerning the business of the Company, including: (1) business plans; (2) historical and projected financial information and budgets; (3) customer lists and information, price lists and market studies; (4) ideas, techniques, designs, modifications, processes, and improvements; (5) employee training and techniques and materials; (6) personnel information, including, but not limited to the names, background, compensation, benefits, addresses and phone numbers of employees; (7) trade secrets and other proprietary information; and (8) notes, analysis, compilations, studies, summaries, specifications, data, processes, designs, photographs, illustrations, graphs and samples related to any of the foregoing.

3.2    <u>Agreements Regarding Confidential Information</u>.  The Shareholder represents and warrants that, prior to the date of this Agreement, Shareholder has held in strict confidence all Confidential Information and has not used it for any purpose, except as expressly authorized by the Company.  The Shareholder agrees as follows:

(a)    The Shareholder will not disclose or use any Confidential Information except (1) with the specific prior written consent of the Company; (2) after any such information becomes generally publicly known in a manner unrelated to the any act or omission of the Shareholder; and (3) in response to compulsory legal process that requires disclosure of such information, provided that the Shareholder has complied with the following procedures: (i) the Shareholder immediately delivers a copy of such process to the Company and (ii) the Shareholder does not disclose any information until the last day indicated in the legal process or, if the Company timely and properly objects to the disclosure and notifies the Shareholder that it has made such objections, only when and if such objections have been overruled.

(b)    The Shareholder will hold all Confidential Information in strict confidence and take all steps necessary and reasonable to safeguard any document, record, plan, model, component, device, computer software or source code, or any other item containing Confidential

DC01:460056.1

3

HHI22763

Information, however documented (collectively, the "Proprietary Items"). The Shareholder recognizes that all of the Proprietary Items are the exclusive property of the Company.

     3.3    Disputes and Controversies. The Shareholder recognizes that should a dispute or controversy arising from or relating to this Agreement be submitted for adjudication to any court, arbitration panel, or other third party, the preservation of the secrecy of Confidential Information may be jeopardized. All pleadings, documents, testimony, and records relating to any such adjudication will be maintained in secrecy and will be available for inspection by designated representatives, attorneys and experts of the Company and of the Shareholder, who will agree, in advance and in writing, to receive and maintain all such information in secrecy, except as the parties may otherwise agree in writing.

     4.    Miscellaneous.

     4.1    Injunctive Relief and Additional Remedies. The Shareholder acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement, including any provision of Sections 1, 2.2 or 3.2, would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement.

     4.2    Essential and Independent Agreements. The agreements by the Shareholder in Sections 1, 2.2, 3.1 and 3.2 are essential elements of this Agreement, and without the Shareholder's agreement to Sections 1, 2.2, 3.1 and 3.2, the Company would not have entered into this Agreement or the Subscription Agreement and Shareholder would not have entered into the Subscription Agreement or agree to be bound by its terms. The Company and the Shareholder have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such agreements, with specific regard to the nature of the business conducted by the Company.

     4.3    Binding Effect; Delegation of Duties Prohibited. This Agreement shall inure to the benefit of, and shall be binding upon, the Company and its successors, assigns and legal representatives, including any entity with which the Company may merge or consolidate or to which all or substantially all of its assets may be transferred. The duties and covenants of the Shareholder under this Agreement, being personal, may not be delegated or assigned, but shall be binding upon the heirs and legal representatives of the Shareholder.

     4.4    Notices. All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand with written confirmation of receipt, (b) sent by facsimile with written confirmation of receipt, provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service with written confirmation of receipt, in each case to the appropriate addresses and facsimile numbers set forth on the signature page or to such other addresses and facsimile numbers as a party may designate by notice to the other parties.

HHI22764

4.5    <u>Entire Agreement; Amendments</u>.  With respect to the subject matter hereof, this Agreement contains the entire agreement between the parties and supersede all prior agreements and understandings, oral or written, between or among the parties hereto and/or Milestone Capital Management I, LLC with respect to the subject matter hereof, including, but not limited to the "Restrictive Covenant" section of the letter agreement, dated November 6, 2006, by and between the Shareholder and Milestone Capital Management I, LLC. This Agreement may not be amended orally, but only by an agreement in writing signed by each of the parties hereto.

4.6    <u>Governing Law</u>.  This Agreement will be governed by the laws of the State of Delaware without regard to conflicts of laws principles.

4.7    <u>Severability</u>.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

4.8    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

*[Remainder of Page Intentionally Left Blank]*

HHI22765

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement as of the date above first written above.

THE COMPANY:

Name: _____

Title:

Notice Address:

Houston Harvest, Inc.
Attention: Chief Executive Officer
3501 Mt. Prospect Rd.
Franklin Park, IL 60131

SHAREHOLDER:

_____

Brett Glass

Notice Address:

DC01:460056.1

6

HHI22766

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement as of the date above first written above.

THE COMPANY:

_____
Name:
Title:

Notice Address:

Houston Harvest, Inc.
Attention:  Chief Executive Officer
3501 Mt. Prospect Rd.
Franklin Park, IL 60131

SHAREHOLDER:

_____
Brett Glass

Notice Address:

BRETT GLASS
14717 FARLEY
OVERLAND PARK KS 66221

DC01:460056.1                         6

HHI22767

## SEPARATION AND MUTUAL RELEASE AGREEMENT

This Separation and Mutual Release Agreement (this "Agreement") dated as of March _____, 2007 is entered into by and among Houston Harvest, Inc., a Delaware corporation ("HHI"), and Brett Glass, an individual residing at 14717 Farley, Overland Park, Kansas 66221 ("Glass" or "you"). HHI and Glass are sometimes referred to herein individually as a "Party" and collectively, as the "Parties."

### RECITALS

1.      HHI and Glass entered into an employment agreement dated as of November 3, 2006 (the "Employment Agreement") and certain disputes have arisen among the Parties related to the related to the HHI/Glass Documents as defined below (the "Disputes").

2.      On or about November 20, 2006, HHI and Glass entered into a shareholders agreement (the "Shareholders Agreement"), a subscription agreement (the "Subscription Agreement") and a non-solicitation, non-competition and confidentiality agreement (the "Non-Compete Agreement") (collectively, the Employment Agreement, Shareholders Agreement, Subscription Agreement and Non-Compete Agreement and any other agreements executed by the Parties on or about said date shall be referred to as the "HHI/Glass Documents").

3.      In connection with the Shareholders Agreement and the Subscription Agreement, Glass purchased [110] shares of capital stock of HHI (the "Purchased Shares").

4.      The Parties desire to resolve and settle the Disputes in an amicable and confidential manner in accordance with the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the promises set forth below, the parties hereto agree as follows:

1.      RECITALS.   The Recitals set forth above are hereby incorporated by reference into this Agreement.

2.      SEPARATION AND EMPLOYMENT AGREEMENT.   Effective as of February 23, 2007, ("Separation Date") the Parties mutually agreed to terminate Glass' employment as CEO of HHI. In connection therewith, Glass resigned his position as member of HHI's board of directors. The Parties reaffirm Glass' separation and resignation.

In connection with the separation, on the Effective Date, HHI shall pay Glass $9,000.00, which amount is the amount of the unpaid base salary due to Glass through the Separation Date. On or before the Effective Date, HHI shall also reimburse Glass for the business expenses incurred by Glass and which are specified on Exhibit A attached hereto and Glass shall also be permitted to retain for his personal use each of the Sony Laptop and docking stations Motorola Q Device in his possession, provided, however, that the retention of these items of property will be taxable to Glass as an IRS Code Section 1099 employee as Glass has ceased to be a full-time employee of HHI and is now an IRS Code Section 1099 employee. Glass has elected to continue his health insurance benefits under COBRA through HHI and HHI will provide Glass with the required

2038665.11



HHI13676

paper work to effectuate the same to ensure Glass retains all rights thereunder. HHI agrees to pay the monthly COBRA premiums on Glass' health insurance benefits beginning on the first day after the Separation Date that said COBRA benefits are available to Glass up through and including the month of August 2007. The monthly premium cost of said COBRA benefits is $1,224.95 and the total amount to be paid by HHI is $7,349.70 ("HHI COBRA Payments") which will cover Glass' COBRA health insurance premiums offered through HHI up to and including the month of August 2007. In the event Glass notifies HHI that Glass no longer needs said COBRA health insurance benefits, HHI will immediately pay to Glass the difference between $7,349.70 and the amount paid to date by HHI for Glass' COBRA health insurance benefits from the Separation Date forward.

Subject to the terms herein, the Parties agree that the Employment Agreement is terminated in its entirety including without limitation any obligation of HHI to provide options, severance or other payments or benefits of any kind.

3.     NON-COMPETE AGREEMENT. Subject to the terms herein, Glass shall remain bound by all of the terms and conditions of the Non-Compete Agreement. Notwithstanding the foregoing, the HHI Released Parties acknowledge that the Glass Released Parties have participated in the operation and management of Gift Card Impressions LLC, a Delaware limited liability company ("GCI"). GCI is involved in the marketing and sale of gift card holders (the "Approved GCI Business"). The HHI Released Parties agree to waive the restrictions of Section 2.2 of the Non-Compete Agreement solely with respect to the continuing operation of the Approved GCI Business as it is currently conducted, provided, however, that the HHI Released Parties are not releasing the Glass Released Parties from any other provision of the Non-Compete Agreement relating to GCI or the Approved GCI Business, including without limitation the non-solicitation provisions contained therein or from any future violation of Section 2.2 of the Non-Compete Agreement relating to or arising from any changes in the business or operations of GCI or the Approved GCI Business that would make it a "Competing Business" as defined in Section 2.2 of the Non-Compete Agreement. Notwithstanding the foregoing, the Parties agree that this Agreement does not create new or additional rights limiting competition by any person or entity, and that the Non-Compete Agreement is the exclusive source of any non-compete right, duty or obligation(s) against the party or parties as set forth therein.

In the event that Glass accepts future employment with any of, Hallmark, American Greetings, 800 Flowers or any entity or business conducting the sale of food gifts by or over the Internet (the "Internet Food Sellers"), then Glass shall, prior to commencing employment with any Internet Food Seller, notify HHI in writing, of the name of his new employer (the "New Employer") and, prior to the commencement of his employment with the New Employer, Glass shall be required to notify his supervisor at the New Employer or the New Employer's human resources department of the restrictions contained in this Agreement. Within 7 days of such notification, if New Employer requires said notification to be in writing, Glass shall provide a copy of said written notification to HHI ("Written Notification"). If Glass complies in full with the terms hereof, the New Employer shall not be included in the definition of "Competing Business" in Section 2.2 of the Non-Compete Agreement, provided said New Employer does not sell seasonal or non seasonal food gifts or popcorn tins to the mass retail, drug, grocery or club channels of distribution. If, however, (i) New Employer requires Glass provide New Employer with Written Notification of the restrictions contained in this Agreement and Glass fails to provide HHI with said Written Notification or (ii) if the New Employer sells seasonal or non

2

2038665.11

HHI13677

seasonal food gifts or popcorn tins to the mass retail, drug, grocery or club channels of distribution and Glass is unwilling to provide an affidavit attesting to the fact that, he was not employed by or associated or involved with (and that he will not, so long as the Non-Compete remains in effect, be employed by, associated or involved with), directly or indirectly, any division, subsidiary, affiliate, shareholder or related party of the New Employer that was, or is then, involved, directly or indirectly, in such competitive activities, then HHI shall be entitled to pursue any and all remedies available to the HHI under the Non-Compete Agreement, in law or equity.

For purposes of this Agreement, the Approved GCI Business is not included in the definition of "Work Product" or "Confidential Information" as defined in the November 3, 2006, letter agreement executed between the Parties.

4.    STOCK RE-PURCHASE; SHAREHOLDERS AND SUBSCRIPTION AGREEMENT. HHI shall repurchase the Purchased Shares from Glass for the price of $110,000 (the "Repurchase Price") and the Purchased Shares shall immediately be cancelled and terminated upon payment in full to Glass of the Repurchase Price in accordance with the terms herein, provided, however, that as of the Separation Date, Glass shall no longer have any rights as a stockholder of HHI or of any of its affiliates or related parties. In addition, on the date hereof, the Subscription Agreement and the Shareholders Agreement (other than the Non-Compete Agreement (an Exhibit to the Shareholders Agreement) which shall remain in full force and effect) shall terminate and be of no further force or effect and the Repurchase Price will be the only amount required to be paid to repurchase the Purchased Shares.

5.    DISMISSAL OF LEGAL ACTION. Glass, through his attorney, agrees to take all steps necessary to dismiss with prejudice the pending case captioned Brett Glass vs. Houston Harvest, Inc. filed on February 28, 2007, in the Circuit Court of Johnson County, Kansas, Civil Court Department, within five (5) days of receipt of a fully executed copy of this Agreement. No payments shall be made until the legal action has been dismissed and evidence provided to the Parties of same. HHI agrees that Glass' rights to refile the Case may not be extinguished by the passage of time and in the event of any breach by HHI, HHI waives the right to assert that Glass' rights to refile the Case are barred by the passage of time or any rule or statute relating to the same.

6.    SEPARATION BENEFITS. In consideration for signing and complying with this Agreement and in full settlement of all claims, direct or indirect, which were or could have been asserted by Glass against any of the HHI Released Party through the date of this Agreement relating to or arising from the Disputes, HHI agrees, in addition to the HHI COBRA Payments in Section 2 and the Repurchase Price set forth in Section 4 above, to pay Glass an additional amount of $107,650.30 (the "Separation Amount"). With respect to the Repurchase Price and Separation Amount, HHI shall make payments in the order as follows: (1) the aggregate amount of the Repurchase Price shall be payable to Glass at a rate of $9,068.76 per month, commencing in June 2007 through May 2008 with a final Repurchase Price payment of $1,174.88 in June 2008 and (2) the aggregate amount of the Separation Amount shall be payable to Glass at a rate of $7,893.88 for the month of June 2008 and continuing each month thereafter at a rate of $9,068.76 until paid in full (collectively, the HHI COBRA Payments, Repurchase Price and Separation Amount shall be referred to herein as the "Separation Payments"). As security for payment of the Separation Payments and any other amounts due Glass hereunder, HHI agrees to

3

2008665.11

provide an irrevocable letter of credit in a form agreed to by Glass and HHI and attached hereto as Exhibit B ("Letter of Credit") provided that Glass shall pay 50% of the costs associated with securing the Letter of Credit (which shall be deducted from the Separation Payments payable hereunder) and HHI shall pay 50% of the costs associated with securing the Letter of Credit.

The Separation Payments shall be payable on the first day of each month (or if the first day of the month is a weekend day or holiday, the first day of the month that is not a weekend day or a holiday) commencing in June, 2007 (except for the HHI COBRA Payments as set forth in Section 2 herein). If HHI fails to deliver any monthly Separation Payment within ten (10) days of its due date, then the amounts remaining unpaid shall accrue interest at a rate of two percent (2%) per month until paid.

If HHI fails to make any monthly Separation Payment ("Missed Separation Payment") required to be made hereunder within 60 days following written notice from Glass of the past due amount, then, in addition to any other rights or remedies Glass may have hereunder, Glass may terminate this Agreement and immediately draw upon the Letter of Credit. If, however, HHI makes any Missed Separation Payment prior to the conclusion of said 60 day period, and therefore, does not trigger payment under the Letter of Credit, the 60 day period as referenced in the previous sentence shall be changed from 60 days to 10 days for any future Missed Separation Payment.

7.     MUTUAL WAIVER AND RELEASES

(a)     DEFINITIONS. For purposes of this Agreement, (i) the "HHI Released Parties" shall include without limitation HHI, Houston Harvest Acquisition, LLC Blackstreet Capital Partners (AI), LP, Blackstreet Capital Partners (QP), LP, Blackstreet Capital Advisors, LLC, Blackstreet Capital Management, LLC, MMP Capital Partners (AI), LP, MMP Capital Partners (QP), LP, Milestone Capital Advisors, LLC, Milestone Capital Management I, LLC, Milestone Capital Management, LLC and its and their related or affiliated entities and any entities controlled through common ownership or otherwise by any of these entities and any of its or their former or current subsidiaries, parents, predecessors, successors, subsidiaries, and assigns and each and every one of the HHI Released Parties' former or current directors, officers, employees, agents, parents, affiliates, successors, predecessors, subsidiaries, assigns, attorneys, partners, managers, owners, members, shareholders and representatives; and (ii) the "Glass Released Parties" shall include without limitation Glass and any and all of his relatives, related parties, heirs, successors, executors, or other representatives and GCI and any of its former or current directors, officers, employees, agents, parents, affiliates, successors, predecessors, subsidiaries, assigns, attorneys, partners, managers, owners, members, shareholders and representatives.

(b)     GLASS RELEASE. In exchange for the benefits described in this Agreement the Glass Released parties hereby release and forever discharge the HHI Released Parties from any and all claims, known or unknown, covering past, present and future and from any and all charges, claims, damages, injury and actions, known or unknown, in law or equity, which the Glass Released Parties ever had, now have, or may have by reason of any act, omission, matter, cause or thing through the date of the execution of this Agreement relating to all matters and claims that have occurred to date relating to the Disputes. Furthermore, the Glass Released Parties hereby waive and release any and all claims, whether known or unknown, that they may have against any of the HHI Released Parties based on any act, omission, matter, case or thing

4

2038665.11

through the date of your execution of this Agreement including, but not limited to, any claims under Title VII of the Civil Rights Acts of 1964 and 1991; the Americans with Disabilities Act; the Age Discrimination in Employment Act; the National Labor Relations Act; 42 U.S.C. § 1981; the Family and Medical Leave Act; the Employee Retirement Income Security Act of 1974 [other than any accrued benefit(s) to which you have a non-forfeitable right under any pension benefit plan]; any other state, local, and federal employment law; any amendments to any of the foregoing; and common law, including contract and tort claims. Glass also understands there may be other statutes and laws of contract and tort that also relate to Glass' employment. Glass and the Glass Released parties understand that this is a general release.

(c)     **HHI RELEASE.**  In exchange for the benefits described in this Agreement the HHI Released Parties hereby release and forever discharge the Glass Released Parties from any and all claims, known or unknown, covering past, present and future and from any and all charges, claims, damages, injury and actions, known or unknown, in law or equity, which the HHI Released Parties ever had, now have, or may have by reason of any act, omission, matter, cause or thing through the date of the execution of this Agreement relating to all matters and claims that have occurred to date relating to the Disputes. Notwithstanding the foregoing, nothing in this Agreement shall limit the HHI Released Parties from asserting any claim or cause of action against HHIGP Holding Company ("HHIGP"), Houston Harvest Gift Products, LLC ("Seller") or any of its or their affiliates or related parties, excluding individually or as a group the Glass Released Parties, relating in any way to or arising from the Asset Purchase Agreement entered into by and between Houston Harvest Acquisition, LLC, HHIGP and Seller dated as of November 3, 2006 or from any other claims other than as expressly set forth above; provided, however, in the event HHIGP/Seller seeks indemnification from the Glass Released Parties related to the Disputes or the Approved GCI Business, HHI will indemnify the Glass Released Parties to the extent the Glass Released Parties are required to indemnify HHIGP/Seller, including the Glass Released Parties reasonable out of pocket costs and attorneys' fees resulting from the indemnification claims.

8.     **NON-DISPARAGEMENT.**  Glass and any of Glass' relatives who are employed by or who have an ownership interest in GCI, agree that they will not, directly or indirectly, at any time during the Non-Compete Period (as defined in the Non-Compete Agreement) disparage the HHI Released Parties to any party, including but not limited to, customers, vendors, employees and all other parties or individuals, except to respond to appropriate courts of law or as may otherwise be required or compelled.  The HHI Released Parties also agree not to disparage the Glass Released Parties or Approved GCI Business, directly or indirectly, to any party, including but not limited to, customers, vendors, licensors, employees and all other parties or individuals, except to respond to appropriate courts of law or as may otherwise be required or compelled. Notwithstanding the foregoing, HHI and Glass shall prepare a joint statement as set forth on the attached Exhibit C which shall be communicated and distributed to interested parties. Other than this statement, the Parties agree to keep the contents of the Disputes and this Agreement confidential.

9.     **COOPERATION.**  Absent an executed consulting agreement between the Parties hereto, Glass has no duty to cooperate with HHI as to (1) the transition of the business operations of HHI, (2) the defense or prosecution of any claims or actions now in existence or which may be brought in the future against or on behalf of HHI, which relate to events or occurrences that transpired while Glass was employed by HHI or (3) on any other matter not otherwise agreed to

5

2038665.11

by the Parties in said consulting agreement.

10.    NO ADMISSION OF LIABILITY.  This Agreement and the payment made hereunder are undertaken solely for purposes of settlement and shall not constitute an admission of liability or responsibility by any party.  It is expressly understood and agreed that the terms of this Agreement are contractual and not merely recitations and that the agreements herein contained and the consideration transferred are to compromise doubtful and disputed claims, avoid litigation, and buy peace and that no payments made or releases or other consideration given shall be construed as an admission of liability.

11.    NOTICE AND REVOCATION PERIOD.  You have been advised before signing this Agreement to review it with an attorney of your own choice as well as any other professional, such as an accountant or financial advisor, whose advice you value.  You may take up to twenty-one (21) calendar days from the date you receive this Agreement to consider whether to sign and return this Agreement to HHI, attention Gay Burke, Chairman.  If you choose to sign the Agreement before the end of that 21-day period, you certify that you did so voluntarily for your own benefit and not because of any coercion.  After you sign this Agreement, you have seven (7) days in which to revoke it by delivering a written notice to Gay Burke before the end of the seven-day period.  If you timely revoke this Agreement, this Agreement will be null and void and you will not receive any payments or benefits pursuant to this Agreement.  If you do not revoke this Agreement within seven (7) days after you sign it, the Agreement will be final and binding on the Parties ("Effective Date").  If you timely revoke this Agreement, the Parties reserve any and all rights under the existing agreements between the Parties and this Agreement shall in no way have compromised those rights.

12.    NATURE OF AGREEMENT.  By signing this Agreement, the Parties acknowledge that they are making a fully informed and voluntary release of claims.  The Parties acknowledge that they have relied only on the promises written in this Agreement.  Glass understands that the HHI Released Parties believe that at all times during his employment with and separation from HHI they have treated Glass fairly and lawfully and Glass is being offered this Agreement to ensure an amicable separation and assist you in making the transition to other employment.  Absent its revocation and so long as this Agreement remains in full force and effect, this Agreement supersedes and replaces any prior agreements or discussions between Glass and HHI, both written and oral, and including without limitation Glass' Employment Agreement, the Subscription Agreement and the Shareholders Agreement except that the Non-Compete Agreement shall remain in full force and effect as set forth herein.  No waiver of or amendment to any provision of this Agreement will be effective unless in writing and signed by HHI and Glass.  A delay or failure by either Party to exercise any right that is the subject of this Agreement will not be construed as a waiver of that right.  A waiver of a breach on any one occasion will not be construed as a waiver of any other breach.  Regardless of the choice of law provisions of Delaware or any other jurisdiction, the parties agree that this Agreement shall be otherwise interpreted, enforced and governed by the laws of Delaware.  This Agreement will continue in effect until all obligations under it are fulfilled.  If any part of this Agreement is held by a court of competent jurisdiction to be void or unenforceable, the remaining provisions shall continue with full force and effect.  This Agreement is not assignable by either Party without the express written consent of the other Party.  This Agreement is binding on both Parties, each of their heirs and legal representatives and the Companies, their successors and assigns.  This Agreement may be signed in one or more counterparts of which shall be deemed an original copy

2038465.11

of this Agreement and all of which, when taken together, will be deemed to constitute one and the same document.

13.    **NOTICE.** All notices and other communications hereunder shall be made in writing by hand delivery, overnight air courier, or certified or registered mail, return receipt requested, and shall be deemed to be received by the party to whom sent on the date of hand delivery or one (1) Business Day after sending, if sent by overnight air courier, and three (3) Business Days after mailing, if sent by certified or registered mail. All such notices and other communications to a party hereto shall be addressed to such party at the address set forth below or to such other address as such party may designate for itself in a notice to the other party in writing given in accordance with this Section.

**Houston Harvest, Inc.**

**Attn: Gay Burke**

3501 Mt. Prospect Rd.

Franklin Park, IL 60131

**Brett Glass**

14717 Farley

Overland Park, KS 66221

14.    **VICTOR BAEZ LAWSUIT.** The Parties agree that the lawsuit titled Victor Baez versus Houston Harvest Gift Products and Victor Baez versus Brett Glass (the "Baez Lawsuit") naming some or all of the HHI Released Parties and Glass as defendants shall be defended by the HHI Released Parties, with such defense including, but not limited to, the payment of attorney fees and litigation costs and expenses. HHI represents to Glass that he is an insured under an insurance policy procured by HHI and as such will have no personal liability or loss arising from the Baez claim and HHI agrees to indemnify Glass for any loss or liability not covered by such insurance.

15.    **ATTORNEY FEES.** The Parties agree that in any future action or arbitration involving the HHI Released Parties and the Glass Released Parties, or any member thereof, that the Glass Released Party or Parties shall have the right to recover their attorney fees should they be a prevailing party in such suit that is brought by the HHI Released Parties.

[SIGNATURE PAGE FOLLOWS]

7

2038665.11

# EXHIBIT A

## Business Expenses To Be Paid To Glass



9

2038665.11

HHI13683

**Transaction Details**

Learn how to dispute a charge

Rewards Plus Gold Card - 41006  Transaction Detail

| | |
|---|---|
| Transaction Date: | 03/01/2007 |
| Post Date: | No Additional Information |
| Transaction Description: | CING*289509706  B.MIDLAND    TX<br>8003310500<br>Description<br>TELEPHONE SERV |
| Charge: | $19.75 |
| Merchant Address: | CINGULAR WIRELESS LLC<br>2000 W AMERITECH CTR<br>SCHAUMBURG IL 60196<br>USA |
| Merchant Type: | R/F CELLULAR PHONE |
| Doing Business As: | CINGULAR TLG CHICAGO |

Back to Top

*[handwritten:]* FinaL Bill FRoM cinGulAR FoR LAPToP internet service. discontinued on 2/13

$19.75

https://www99.americanexpress.com/mycalcstatment/txnaction?

3/22/2007

10

2038665.11

HHI13684

Transaction Details                                                          Page 1 of 2

Learn how to dispute a charge

Business Gold Rewards Card - 53004 Transaction Detail

Transaction Date:        03/08/2007
Post Date:               03/08/2007
Transaction Description: VZW/APO        800-922-0204   CA
                         N0000000 VZWRLSSTAPOCC
Charge:                  $501.94
Merchant Address:        VERIZON WIRELESS
                         620 COLLEGE DRIVE
                         FOLSOM CA 95630
                         USA
Merchant Type:           IVB CELLULAR PHONE
Doing Business As:       VERIZON WIRELESS

                                                                     Back to Top

2/09 — 3/08 Total Bill
2/09 — 2/23
15/28 days = 53.6%

$501.94
X    53.6%
─────────────
$ 269.03

2038665.[1]

11

HHI13685

**EXHIBIT B**

See Attached

12

2038665.11

HHI13686

 **LaSalle Bank**
ABN AMRO

LaSalle Bank N.A.
ABN AMRO Plaza
540 West Madison Street  26th floor
Chicago, Illinois 60661
(312) 904-8462
Fax (312) 904-6303

Global Trade Advisory

APRIL 2, 2007

BENEFICIARY:                          APPLICANT:
BRETT GLASS                           HOUSTON HARVEST, INC.
ATTN:BRETT GLASS                      ATTN:KEN OLENDZKI
14717 FARLEY                          3501 MT. PROSPECT ROAD
OVERLAND PARK, KS 66221               FRANKLIN PARK, IL 60131-1312

STANDBY LETTER OF CREDIT NUMBER: S597632

AMOUNT USD 225,000.00
(TWO HUNDRED TWENTY FIVE THOUSAND AND 00/100 UNITED STATES
DOLLARS )

DATE OF EXPIRY: JUNE 01, 2008
PLACE OF EXPIRY: OUR COUNTERS

WE HEREBY ESTABLISH OUR IRREVOCABLE TRANSFERABLE STANDBY LETTER
OF CREDIT IN YOUR FAVOR WHICH IS AVAILABLE WITH US FOR PAYMENT
AGAINST PRESENTATION OF THE FOLLOWING DOCUMENT(S):

EXHIBIT B AND EXHIBIT C AS ATTACHED HERETO.

ADDITIONAL CONDITIONS:
PARTIAL AND MULTIPLE DRAWINGS ARE PERMITTED.

THIS STANDBY LETTER OF CREDIT IS TRANSFERABLE, BUT ONLY IN ITS
ENTIRETY.

IF YOU WISH THIS LETTER OF CREDIT BE TRANSFERRED, PLEASE
COMPLETE AND RETURN TO US YOUR TRANSFER INSTRUCTIONS IN THE FORM
ATTACHED HERETO ALONG WITH THE ORIGINAL OF THIS LETTER OF CREDIT
AND ALL AMENDMENTS THERETO AND YOUR PAYMENT FOR OUR CHARGES/FEES
FOR SAME AS SPECIFIED IN THE ATTACHED FORM. (EXHIBIT A)

PER LAWS OF THE U.S. AND REGULATIONS OF THE UNITED STATES
TREASURY, DEPARTMENT OF COMMERCE AND OFFICE OF FOREIGN ASSETS
CONTROL, REQUEST TO TRANSFER THIS LETTER OF CREDIT TO ANY PARTY
IN VIOLATION OF SUCH LAWS AND/OR REGULATIONS IS STRICTLY
PROHIBITED AND WILL NOT BE HONORED.

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT WILL BE
AUTOMATICALLY EXTENDED FOR ADDITIONAL PERIODS OF ONE YEAR FROM
THE CURRENT OR ANY FUTURE EXPIRATION DATE UNLESS WE SEND YOU
WRITTEN NOTIFICATION AT LEAST 60 DAYS PRIOR TO THE THEN CURRENT
EXPIRATION DATE THAT WE ELECT NOT TO EXTEND THIS LETTER OF
CREDIT FOR SUCH ADDITIONAL PERIOD. IN NO EVENT SHALL THIS LETTER
OF CREDIT EXTEND BEYOND JULY 10, 2009 (THE "FINAL" EXPIRY DATE).

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT SHALL
AUTOMATICALLY REDUCE BY THE AMOUNT AND ON THE DATE LISTED
BELOW, PROVIDED LASALLE BANK N.A., HAS NOT RECEIVED EXHIBIT D,
ATTACHED HERETO FROM THE BENEFICIARY AT LEAST 5 DAYS PRIOR TO



HHI13687


**LaSalle Bank**
ABN AMRO

THAT REDUCTION DATE VIA FACSIMILE AT 312-750-0828 OR HAND DELIVERY TO 540 WEST MADISON STREET, 26th FLOOR, CHICAGO, IL 60661, ATTN: STANDBY LC DEPARTMENT.

| DATE: | REDUCED BY: |
|-------|-------------|
| 07/30/07 | $9,068.76 |
| 08/30/07 | $9,068.76 |
| 09/30/07 | $9,068.76 |
| 10/30/07 | $9,068.76 |
| 11/30/07 | $9,068.76 |
| 12/30/07 | $9,068.76 |
| 01/30/08 | $9,068.76 |
| 02/29/08 | $9,068.76 |
| 03/30/08 | $9,068.76 |
| 04/30/08 | $9,068.76 |
| 05/30/08 | $9,068.76 |
| 06/30/08 | $9,068.76 |
| 07/30/08 | $9,068.76 |
| 08/30/08 | $9,068.76 |
| 09/30/08 | $9,068.76 |
| 10/30/08 | $9,068.76 |
| 11/30/08 | $9,068.76 |
| 12/30/08 | $9,068.76 |
| 01/30/09 | $9,068.76 |
| 02/28/09 | $9,068.76 |
| 03/30/09 | $9,068.76 |
| 04/30/09 | $9,068.76 |
| 05/30/09 | $9,068.76 |
| 06/30/09 | $9,068.76 |

DRAFT(S) AND DOCUMENT(S), IF REQUIRED MUST BE FORWARDED TO LASALLE BANK N.A. TRADE OPERATIONS ABN AMRO PLAZA 540 W. MADISON - 26TH FLOOR CHICAGO, IL 60661 ATTN: STANDBY LC DEPT (LNA) IN ONE LOT.

DRAFTS, IF REQUIRED, MUST STATE "DRAWN UNDER LASALLE BANK N.A. LETTER OF CREDIT NUMBER 8597632"

WE HEREBY ENGAGE WITH YOU THAT DRAFT(S), AND DOCUMENT(S) IF REQUIRED, DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS CREDIT WILL BE DULY HONORED BY US IF PRESENTED TO US AT THE ADDRESS STATED HEREIN, ATTENTION GLOBAL TRADE ADVISORY, ON OR BEFORE THE EXPIRATION DATE.

THIS STANDBY LETTER OF CREDIT UNDERTAKING IS ISSUED SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES 1998, INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 590.

LASALLE BANK N.A.

AUTHORIZED SIGNATURE

HHI13688

**LaSalle Bank**
ABN AMRO

EXHIBIT A
APPLICATION FOR FULL TRANSFER OF LETTER OF CREDIT

DATE: _____

TO: LASALLE BANK N.A.
    540 W. MADISON - 26TH FLOOR
    CHICAGO, IL 60661
    ATTN: STANDBY LETTER OF CREDIT DEPT.
RE: L/C NO: S597632
ISSUED BY: LASALLE BANK N.A.

FOR VALUE RECEIVED, THE UNDERSIGNED BENEFICIARY HEREBY
IRREVOCABLY TRANSFERS TO:

    _____
    (NAME OF TRANSFEREE)

    _____
    (ADDRESS)
ALL RIGHTS OF THE UNDERSIGNED BENEFICIARY TO DRAW UNDER THE ABOVE
LETTER OF CREDIT IN ITS ENTIRETY.

BY THIS TRANSFER, ALL RIGHTS OF THE UNDERSIGNED BENEFICIARY IN
SUCH LETTER OF CREDIT ARE TRANSFERRED TO THE TRANSFEREE AND THE
TRANSFEREE SHALL HAVE THE SOLE RIGHTS AS BENEFICIARY THEREOF,
INCLUDING SOLE RIGHTS RELATING TO ANY AMENDMENTS WHETHER
INCREASES OR EXTENSIONS OR OTHER AMENDMENTS AND WHETHER NOW
EXISTING OR HEREAFTER MADE. ALL AMENDMENTS ARE TO BE ADVISED
DIRECT TO THE TRANSFEREE WITHOUT NECESSITY OF ANY CONSENT OF OR
NOTICE TO THE UNDERSIGNED BENEFICIARY.

THE ORIGINAL OF SUCH LETTER OF CREDIT IS RETURNED HEREWITH
TOGETHER WITH ANY AND ALL AMENDMENTS, AND WE ASK YOU TO ENDORSE
THE TRANSFER ON THE REVERSE THEREOF, AND FORWARD IT DIRECTLY
TO THE TRANSFEREE WITH YOUR CUSTOMARY NOTICE OF TRANSFER.

NAME OF BENEFICIARY _____

AUTHORIZED SIGNATURE _____

NAME & TITLE _____

SIGNATURE GUARANTEED
_____
THE SIGNATURE AND TITLE CONFORMS WITH THAT ON FILE
WITH US FOR THIS COMPANY AND SIGNER IS AUTHORIZED
TO EXECUTE THIS AGREEMENT. WE ATTEST THAT THE COMPANY
HAS BEEN IDENTIFIED BY US IN COMPLIANCE WITH
USA PATRIOT ACT PROCEDURES OF OUR BANK.

_____
(NAME OF BANK)

_____
(ADDRESS OF BANK)

HHI13689

**LaSalle Bank**
ABN AMRO

(CITY, STATE, ZIP CODE) _____

(AUTHORIZED NAME AND TITLE) _____

(AUTHORIZED SIGNATURE) _____

(TELEPHONE NUMBER) _____

TRANSFER FEE: 0.25%, MINIMUM USD 250.00 OF AMOUNT TRANSFERRED

HHI13690



**EXHIBIT B**
**SIGHT DRAFT**

_____ , 20__

At ___ SIGHT ___ of this SOLE BILL OF EXCHANGE,
Pay .
the sum of US$ _____
( _____
U.S. DOLLARS).

Drawn on:                                    Beneficiary: _____
LaSalle Bank N.A.                            Signature: _____
540 West Madison, Suite 2600                 Name: _____
Chicago, Il. 60661                           Title: _____
Attn: Standby LC Dept.

Drawn under LaSalle Bank N.A. Standby Letter of Credit No. 3597632 dated April 2,
2007

HHI13691



**LaSalle Bank**
ABN AMRO

<u>**EXHIBIT C**</u>

**EXHIBIT C TO IRREVOCABLE LETTER OF CREDIT
NO. 8597632**

TO:        LaSalle Bank N.A.
        Global Trade Advisory- Standby LC Dept.
        ABN AMRO Plaza
        540 West Madison – 26th Floor
        Chicago, Illinois 60661

Dear Sirs:

        Brett Glass ("Glass") states that:

Check one line (1, 2, 3 or 4) as applicable:

    [ ]    1(a).    Applicant, Houston Harvest, Inc., a Delaware Corporation ("HHI") has failed to timely pay the monthly installment due under that certain Separation and Mutual Release Agreement dated March _____, 2007 (the "Agreement"), executed by HHI and Glass which provides for payments by HHI to Glass in the aggregate amount of $225,000.00;

        1(b).    Glass has given a 60-day written notice to HHI as provided in the Agreement, and HHI has failed to pay the amounts called for therein; and

        1(c).    The amount presently due in favor of Glass under the terms of said Agreement is the amount set forth in the sight draft accompanying this Certificate.

                  **OR**

    [ ]    2(a).    HHI has failed to timely pay the monthly installments due under the Agreement;

        2(b).    HHI has previously defaulted in making monthly payments under the Agreement, sixty (60)-day written notice was sent, and during the sixty (60)-day period, HHI made the payment called for; ···



HHI13692



2(c).    Ten (10)-day written notice has been given to HHI with respect to the current failure to pay, and said failure has not been cured; and

2(d).    The amount presently due in favor of Glass under the terms of said Agreement is the amount set forth in the sight draft accompanying this Certificate.

**OR**

☐    3(a).    There are less than sixty (60) days remaining until the expiration of your Letter of Credit and we have received from you written notice of non-renewal; and

3(b).    The amount presently due in favor of Glass under the terms of the Agreement is the amount set forth in the sight draft accompanying this Certificate.

**OR**

☐    4(a).    There are less than thirty (30) days remaining until the expiration of your Letter of Credit and we have received no extension or renewal of the Letter of Credit; and

4(b).    The amount presently due in favor of Glass under the terms of the Agreement is the amount set forth in the sight draft accompanying this Certificate.

IN WITNESS WHEREOF, Brett Glass has caused this instrument to be executed and delivered as of the date set forth below.

_____
BRETT GLASS

Dated: _____

HHI13693

**LaSalle Bank**
ABN AMRO

EXHIBIT D TO LETTER OF CREDIT NO. 8397632

DATE                    , 200

LASALLE BANK
540 WEST MADISON STREET-26TH FLOOR
CHICAGO, IL 60661

ATTENTION: STANDBY LC DEPARTMENT

RE:  OBJECTION TO AUTOMATIC DECREASE OF IRREVOCABLE STANDBY LETTER OF CREDIT NO. 8397632 DATED _____

LADIES AND GENTLEMEN:

I HEREBY CERTIFY THAT I HAVE NOT RECEIVED THE SCHEDULED PAYMENT FOR THE MONTH OF _____, 200  FROM HOUSTON HARVEST, INC. UNDER THE ABOVE-REFERENCED IRREVOCABLE STANDBY LETTER OF CREDIT.

ACCORDINGLY, THE MAXIMUM AVAILABLE AMOUNT UNDER IRREVOCABLE STANDBY LETTER OF CREDIT SHALL NOT BE AUTOMATICALLY REDUCED ON THE SCHEDULED REDUCTION DATE OF _____ 30, 200__.

VERY TRULY YOURS,

BRETT GLASS

HHI13694

HHI13695

## **EXHIBIT C**

### Joint Statement of HHI and Glass to be given to Interested Parties

After more than 12 years of service, Brett Glass, President and CEO of Houston Harvest Inc. has resigned from the company to pursue other business interests. Brett's many contributions to the company include the merger of Golden Harvest Popcorn Company with Houston Foods, the creation of licensed gifts within the industry and the building of Houston Harvest's industry leading team of Mangers and employees. Brett is looking forward to his future endeavors that hopefully will allow him to spend less time traveling and more time with his family. We wish Brett the very best and are certain he will continue to bring insight and vision to the next opportunity he leads.

Gay Burke has been named Executive Chairman of Houston Harvest Inc. and will assume Brett's responsibilities. Gay was previously Chief Executive Officer of Pumpkin Masters, the leading Halloween accessory company known for its innovative pumpkin carving kits. "Gay's deep experience in the seasonal products industry and dealing with mass retailers is a perfect fit for Houston Harvest," said Murry Gunty of Blackstreet Capital Management.

14

2038665.11

HHI13696

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement as of the date first above written and have proper legal authority to execute this Agreement on behalf of the undersigned.

**HOUSTON HARVEST, INC.**

By: _____

Name: Gay Burke
Title:   Chairman and
Authorized Representative of
Houston Harvest, Inc.

_____
BRETT GLASS

2038665.11

8

HHI13697

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the date first above written and have proper legal authority to execute this Agreement on behalf of the undersigned.

**HOUSTON HARVEST, INC.**

By: _____

Name: Gay Burke
Title:  Chairman and
Authorized Representative of
Houston Harvest, Inc.

*Brett Glass*

BRETT GLASS

2U3R665.11

8

HHI13698

℀JS 44  (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Houston Harvest, Inc.

## DEFENDANTS

Brett Glass

(b) County of Residence of First Listed Plaintiff    Kent County, Delaware
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Johnson County, Kansas
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Charles J. Brown, III  Archer & Greiner PC  300 Delaware Avenue,
Suite 1370, Wilmington, DE 19801 (302) 777-4350

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
       Plaintiff

☒ 3  Federal Question
       (U.S. Government Not a Party)

☐ 2  U.S. Government
       Defendant

☒ 4  Diversity
       (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | **PERSONAL PROPERTY** | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 380 Other Personal | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | ☐ 385 Property Damage | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | Product Liability | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1  Original
       Proceeding

☐ 2  Removed from
       State Court

☐ 3  Remanded from
       Appellate Court

☐ 4  Reinstated or
       Reopened

☐ 5  Transferred from
       another district
       (specify)

☐ 6  Multidistrict
       Litigation

☐ 7  Appeal to District
       Judge from
       Magistrate
       Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332

Brief description of cause:
Defendant, former CEO of Plaintiff breached his Non-Competition and Confidentiality Agreement

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $
114,999.00

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE
08/08/2008

SIGNATURE OF ATTORNEY OF RECORD
/s/ Charles J. Brown, III (Bar No. 3368)

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

JS 44 Reverse  (Rev. 12/07)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.**  **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.**  **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**  **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**  **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.**  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**    Example:  U.S. Civil Statute: <u>47 USC 553</u>
  Brief Description: <u>Unauthorized reception of cable service</u>

**VII.**  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.